STATE OF NORTH CAROLINA v. JULIUS CEDRICK JOHNSON

No. 506A84

(Filed 12 August 1986)

1. **Criminal Law § 34.5— evidence of other crimes—competency to show identity of defendant**

In a prosecution for three counts of first degree rape and three counts of armed robbery, evidence relating to four other rapes and robberies committed earlier in the year was admissible to prove defendant's identity as the

perpetrator of the crimes charged where all of the rapes occurred in the vicinity of Wendover Road; defendant identified himself to the three victims in this case as the "Wendover rapist"; and the four prior rapes were interrelated by a number of unusual and peculiar circumstances which together logically tended to show that the same assailant committed all the crimes.

**2. Jury § 7.7— denial of challenge for cause—appellate review—necessity for peremptory challenge**

A party who has a peremptory challenge available when a challenge for cause of a prospective juror is denied must then exercise a peremptory challenge to remove the unwanted juror in order to preserve his right to appeal the unsuccessful challenge for cause. N.C.G.S. §§ 15A-1214(h)(2), (i)(1) and (2).

**3. Rape and Allied Offenses § 6— instruction defining vaginal intercourse—penetration of female sex organ**

The legislature did not intend to alter the penetration required for the offense of rape when it employed the term "vaginal intercourse" in N.C.G.S. § 14-27.2. Therefore, the trial court did not err in instructing the jury that vaginal intercourse is penetration, however slight, of the female *sex organ* by the male sex organ rather than giving defendant's requested instruction that vaginal intercourse is the slightest penetration of the female *vagina* by the male sex organ.

**4. Rape and Allied Offenses § 6.1— first degree rape—necessity for instruction on attempted rape**

The trial court in a first degree rape case erred in failing to instruct the jury on attempted first degree rape with respect to one victim where there was conflicting evidence as to penetration in her case.

Justice BILLINGS took no part in the consideration or decision of this case.

APPEAL by defendant under N.C.G.S. § 7A-27(a) from judgments of *Ferrell, J.*, returned at the 8 May 1984 Criminal Session of MECKLENBURG County Superior Court, where defendant was convicted of three counts of first degree rape and three counts of armed robbery and was sentenced to life for each first degree rape conviction and forty years for each armed robbery conviction, all sentences to run consecutively.

*Lacy H. Thornburg, Attorney General, by George W. Lennon, Assistant Attorney General, for the state.*

*Isabel Scott Day, Public Defender, by Marc D. Towler, Assistant Public Defender, for defendant appellant.*

EXUM, Justice.

The questions presented in this appeal are whether the trial court erred in (1) admitting evidence of crimes other than those

being tried; (2) denying defendant's motion to excuse a juror for cause; (3) its instructions on the meaning of "vaginal intercourse"; and (4) refusing to instruct on the lesser included offense of attempted first degree rape. We find reversible error only in Judge Ferrell's failing to instruct the jury on attempted first degree rape as to one of the victims. Accordingly, we grant defendant a new trial on the charge of first degree rape as to this victim. We leave undisturbed defendant's remaining convictions and judgments entered thereon.

## I.

The state produced evidence which tended to show that on the morning of 23 December 1983 Hope Untener and Sonia Hasbun were packing to move out of their apartment at 1536 Delane Avenue in Charlotte. Their friend Kelly Gallant arrived at the apartment around 6:30 a.m. to carry Hasbun to the airport. Soon after she arrived, a man wearing a stocking over his head, a blue glove with red leather on it and carrying a double-barreled shotgun entered the apartment. Gallant recognized the glove and the stocking as items she had left in her car.

The intruder pointed the shotgun at the three women, threatened to kill them if they did not stop screaming, and demanded money. The women obtained their wallets and placed them on the floor in front of them.

After asking who lived in the apartment, to whom the car belonged and whether they were moving in or out, the man announced, "We've got some business to take care of." He asked, "Do you know who I am?" In response to their answer they did not, he said, "Are you stupid or something? . . . I'm famous . . . . I'm the Wendover rapist . . . . I'm on TV every day of the week. They know about me. I'm on Crime Stoppers."

The man ordered the women to strip. Untener told him she had friends coming over to take them to the airport but the man was not dissuaded and said, "I don't care. It won't take long."

The intruder ordered the women to perform manual and oral sex acts on each other while he watched. Stating it was his turn and up to him to finish the rest, he made the women lie side by side on the floor. He first got atop Hasbun and told her, "Put

your hand around my penis and put me in." The assailant then went to Untener and Gallant in succession and instructed each likewise to "put it in," which they did. After finishing, the man announced they were going to do it again.

The man went back to each woman in the same order as the first time. After a second round of similar sexual assaults, the assailant put his pants on and ordered Gallant to pick up the money. As she did, she noticed beside her a black wallet she did not recognize. After pocketing the money, the man herded the three women into Hasbun's bathroom and left.

All three women were unable to recognize their assailant. They observed he was wearing brown shoes, beige pants, an orange windbreaker and green shirt with a beige collar. They also observed he was black, 5 feet 10 inches and about 170 pounds.

The police arrived at the scene of the attack and found a black wallet lying on the floor which contained a driver's license bearing defendant's name and photograph, as well as a Kroger card with defendant's name on it.

Defendant was arrested at 815 Villa Court, his mother's home, on 23 December 1983. He was wearing brown pants, a beige shirt and brown shoes. Two shotgun shells and $22 in change were taken from his pants pocket. Defendant's clothes were seized and pubic hair combings, head hair, pubic hair and saliva samples were also taken. A red and blue glove also was taken from the trunk of his mother's car.

Louis Portis, Ph.D., a criminologist, examined the clothes taken from defendant and discovered three fibers on the inside of the pants leg and one fiber each on a sock and the right shoe. He compared them to a carpet sample from 1536 Delane Avenue and fibers found on the red and blue glove seized from defendant's mother's car. He concluded all the fibers came from the same run of carpet. Dr. Portis also observed that the glove seized was a right glove while the glove remaining after the attack in Gallant's car was a left glove; both were made of 100 percent acrylic nylon. Finally, Dr. Portis compared a pubic hair sample from Gallant with a Caucasian pubic hair combed from defendant and found the two to be consistent.

After defendant's rights were explained to him and he agreed to talk, the police asked why the crimes happened. Defendant responded that he had a problem and knew something was wrong with him; but if he told why, he would be admitting it. He stated as long as he did not admit it, his mother might believe he was innocent. Defendant interjected, "Besides, you don't even have the shotgun, do you?" According to the interrogating officer, defendant had not been told a shotgun was involved. Defendant also offered to confess to the 23 December 1983 crimes if the police would not charge him with others. The officer denied having told defendant he was a suspect in any other crimes. Asked how many crimes there were, defendant looked into the air and started counting, stopping at eight. Defendant also stated he knew who the "Wendover rapist" was but had to think of what his family would think.

In addition to this evidence relating to the offenses committed on 23 December, the state also introduced evidence regarding four other rapes and robberies committed earlier in the year. Defendant filed motions in limine to exclude the evidence, but the trial court denied the motions.

Defendant offered no evidence.

## II.

[1] Defendant assigns error to the trial court's admission of evidence relating to four other rape and robbery offenses in addition to those charged in this case for the purpose of proving defendant's identity as the perpetrator of the offenses charged. We find no error.

The other crimes evidence was as follows:

Beth Thrift testified that on 17 June 1983 around 2:30 a.m. a young black male between 18 and 24 years old, about 5 feet 9 inches tall and weighing 160 pounds, jumped on top of her as she lay sleeping in her condominium on 920 Hollywood Drive. The man placed a knife to her throat and threatened to kill her and her son if she said a word. Thrift testified her son was not sleeping in the condominium that evening and nothing visible in the child's room would have distinguished the sex of the child as a boy. After again threatening to kill Thrift and her son, the man

unzipped his jeans, lowered them slightly and lay on top of her. He took her left hand, clasped it around his penis, and ordered, "Put it in." After she complied, the man began intercourse and made several comments to her. He asked, "When is your man going to be home?" and instructed her to kiss him. When she refused, he said, "What's the matter; don't your man do it this way?" and "Why don't you move? Don't you enjoy it?" After he ejaculated, the man got off Thrift and asked further questions about when her man was coming home and where her telephone was. He threatened once more to kill her and her son if she said a word, then went downstairs. Thrift heard him jingle some keys or money in the kitchen before he left. She waited awhile and then ran next door to her neighbor, Melinda Sikes Fare, whose roommate notified the police. Ms. Thrift was unable to identify her assailant. The police took the sheet from a bed. Dr. Portis found two Negroid pubic hairs which he compared with hairs taken from defendant. In his opinion they were consistent. The police dusted for fingerprints on two windows Thrift had left open before going to bed but found none.

Linda Norden testified that on 4 July 1983 her roommate was at the beach and she was sleeping alone in her duplex at 809 Bertonly Avenue. Sometime after she retired around 1:30 a.m., she was awakened by the glass in her back door shattering. A slim black male about 5 feet 10 inches tall in his early 20's appeared in her bedroom. After questioning Norden about where her roommate and dog were and going into the kitchen and her roommate's bedroom, the man climbed up on her bed armed with a knife. Norden began struggling and screaming and the man struck her several times, splitting her eye and lip and bruising her. She ceased struggling and told the man she had venereal disease. Undeterred, the man began to rape her. During the act, the man asked when was the last time she had been with her man and how he made love. He asked her to participate. When the man finished, he got off the bed and asked for money. The intruder brought Norden her pocketbook and took out her wallet using a handkerchief. When he discovered she had only a dollar, he threatened to kill her if he saw a police car and left.

Deborah Imbriano, aged 26, testified that as she was preparing to leave her apartment at 924-A North Wendover Road to go jogging about 6:30 a.m. on 13 August 1983, she noticed a black

man looking in her window for three or four seconds. He ducked and went around the corner of the building. Imbriano went out the door and saw the same man standing against the building. He said, "Oh, excuse me, I thought you were Susan." The man, with whom she was face-to-face for several seconds, was wearing blue jeans and a blue shirt with a blue collar.

Imbriano went jogging and returned to her apartment about twenty minutes later. When she entered her apartment she noticed her clothes strewn on the floor and a black man standing in her bedroom. The intruder pulled her to the floor before she could flee. He had a knife and a rag in his hand and tried to stuff the rag in Imbriano's mouth when she started screaming. The man said, "Shut up or I'll kill you." The intruder asked Imbriano, "Don't you know about me?" He said, "The police know about me around here" and "You're the third one." Imbriano offered the man $100 and the man walked her to the bedroom, holding the knife either at her abdomen or the side of her neck the whole time. When they got to the bedroom he said she only had $20 and he had already taken that. The man pushed her to the floor of the bedroom and ordered her to remove her clothes. As she did, she told the intruder she was pregnant in an attempt to discourage him, but he responded, "That's okay . . . . The last one told me she had V.D., and I didn't get anything yet."

The intruder ordered Imbriano to lie in the middle of the bed, removed his clothes and climbed on top of her. He forced her hand around his penis and told her to "put it in." While he was raping her, he asked her whether she ever had sex with a black man before, if she had sex the night before and if that was how her husband did it. The intruder next ordered Imbriano to turn over and again forced his penis into her vagina. He then asked if she ever had oral sex, climbed on her chest and forced his penis into her mouth. The assailant then picked the knife up and put on his clothes.

Imbriano had an AM/FM radio laying on the floor beside the bed, and the assailant said he was going to take her "box." Although she was not married, Imbriano told the intruder to leave because her husband would be returning soon. After asking questions about where she and her husband worked and how long they had lived there, the intruder said, "Am I going to have to

cut your wires?" The intruder made Imbriano give him jewelry and her name and telephone number before leaving. A few minutes later the man called Imbriano on the phone and said he was watching her place and had not seen any cops. He called again a couple of minutes later and complained that the radio did not work.

Imbriano did not recognize the man's features because he had a stocking over his head but she recognized him as the man she had seen outside earlier because he had the same voice and wore the same clothing. Later she picked defendant from a lineup and identified him at trial as the man she had seen outside her apartment and who raped her. The police found a blue stocking belonging to Imbriano outside her apartment on the morning of the offense. Dr. Portis testified he found three Negroid head hairs and one Caucasian head hair in the stocking which he found to be consistent with head hairs taken from defendant and Imbriano. Defendant's employer, Michael Bennett, identified a cassette radio as the one he had seen defendant bring in to work around 23 September 1983. Imbriano identified the radio as her own.

Melinda Sikes Fare, aged 34, testified she was awakened at her apartment at 918 Hollywood Drive at 1:39 a.m. on 4 November 1983 by a persistent knocking on her front door and ringing of her doorbell. Fare lived in the apartment with a roommate who worked a nightshift and came in very late. When Fare answered the door, a black man pushed the door open and came into the apartment. Fare screamed loudly several times and retreated into the apartment area. The intruder pushed her down on the floor and was carrying a knife which he used to cut her fingers and right leg. When Fare told him he had cut her, the man responded, "Well, none of the others ever screamed before."

The intruder got up as if to leave but locked the door from the inside instead. He then put the knife in Fare's abdomen and threatened to kill her. He said, "I'll kill you if you scream any more." The man asked for money which Fare said she would have to go upstairs to get. The intruder went upstairs with Fare into her roommate's bedroom. The intruder told Fare to get in the middle of the bed and to get ready. He lowered his pants, pulled open Fare's two robes and told Fare to put her hand on his penis and put it in her vagina. After raping her, the intruder took

Fare's portable General Electric television. Fare told the intruder her roommate would be home soon, and he instructed her to walk downstairs with him and let him out the back door. A few moments after he left, Fare's roommate arrived home and called the police.

Fare was unable to identify her assailant. She could not see the man that entered her apartment well enough to know whether he had anything obscuring his face other than a toboggan, which was pulled down over his ears and covered most of his hair. The police collected the bedspread of Fare's roommate as evidence. Dr. Portis found a Negroid pubic hair fragment on the bedspread and compared it to a pubic hair from defendant. In his opinion the two were consistent. Dr. Portis also discovered one Negroid pubic hair in the pubic combings taken from Fare and concluded it was also consistent with a sample from defendant's hair. Fare identified a 5-inch black-and-white television set seized from defendant's apartment when he was arrested as her television. Fare's employer, David Bussell, also identified the set as a television he owned and gave to Fare around Christmas of 1982. He recognized the set because of the peculiar way the cord was twisted. A few years before he had worked on the inside of the television and left the battery pack out of it. The battery pack was missing from the inside of the television seized from defendant's home.

Evidence of a defendant's past and distinctly separate, criminal activities or misconduct is generally excluded when its only logical relevancy is to suggest defendant's predisposition to commit the type of offenses he is presently charged with. *State v. Shane*, 304 N.C. 643, 653-54, 285 S.E. 2d 813, 820 (1983), *cert. denied*, 465 U.S. 1104, 80 L.Ed. 2d 134 (1984). Where, however, such evidence reasonably tends to prove a material fact in issue in the crime charged, it will not be rejected merely because it incidentally proves the defendant guilty of another crime. *State v. McClain*, 240 N.C. 171, 177, 81 S.E. 2d 364, 368 (1954). In a criminal case, the identity of the perpetrator of the crime charged is always a material fact though not always is it in issue. *See id.* at 175, 81 S.E. 2d at 367. *McClain* enumerates several categories of cases in which evidence of past and independent criminal activity may be properly admissible in those instances where the identity of the perpetrator and other material facts are disputed.

The categories of cases listed in *McClain*, however, are illus-trative and not exhaustive. In circumstances besides those enu-merated in *McClain*, evidence implicating a defendant in the commission of other crimes may tend to prove the identity of the perpetrator of the crime charged and in a proper case be admis-sible.

In this case the state produced strong circumstantial evi-dence linking the 23 December offenses for which defendant was on trial to defendant. Nevertheless, the identity of the assailant on this occasion remains the principal issue in this case. All the elements of robbery and rape, with one exception in connection with the offense against Hasbun discussed below in Part IV, clearly are present. The evidence implicating defendant in the commission of other crimes challenged by defendant is admissible because it reasonably tends to prove that he was the perpetrator of the crimes for which he was tried. The victims of the 23 De-cember assaults were unable to observe their assailant's face because it was obscured by a stocking, but their attacker iden-tified himself as the "Wendover rapist." Evidence tending to prove that defendant was the "Wendover rapist," therefore, also tended to identify defendant as the 23 December assailant. This evidence was not admissible to demonstrate that defendant had a propensity to commit violent crimes. It was admissible solely for the purpose of establishing that defendant and the self-proclaimed "Wendover rapist" who committed the 23 December assaults were one and the same.

The state introduced evidence pertaining to four offenses other than those with which defendant was charged, all of which were rapes. The state also introduced a map of Charlotte re-printed below which shows the location where the four rapes oc-curred as being in the vicinity of Wendover Road.

**State v. Johnson**

The evidence also tends to show the same person committed all four of the Wendover area rapes. The four offenses are inter-related by a number of unusual and peculiar circumstances, which together logically tend to show the same assailant committed all the crimes. The testimony of Thrift, Imbriano and Fare reveals one such circumstance. Their attacker ordered all three women to place their hand on his penis and "put it in." Defendant argues this fact is inconsequential because *in each case the assailant was armed with a knife which would have limited his ability to insert his penis himself.* We are not persuaded that the weapon encumbered the assailant and prompted this instruction. In both the Thrift and Imbriano rapes the assailant clasped the victim's hand in his own free hand and forced it around his penis. In the Imbriano rape the assailant was not even holding a knife because he placed it on a nightstand while he raped her. The testimony of Thrift, Norden and Imbriano refers to another peculiar circumstance attending the attacks against these women. Their assailant asked while he was raping them, "Is this how your man does it?" The foregoing circumstances together logically link one man to all four rapes.

Two of the rapes are connected by another unusual circumstance. Norden testified that she tried to discourage her attacker by telling him she had venereal disease. Imbriano, who was raped a month after Norden, testified that she told her assailant she was pregnant, but he expressed disbelief because "the last one told me she had V.D., and I didn't get anything yet." This evidence strongly suggests that the same man committed the Norden and Imbriano rapes.

The assailant also told Imbriano, "You're the third one." Although standing alone this statement does not indicate Thrift was the first one, it strengthens the state's evidence that Thrift was the first of a series of women raped by the same man.

In both the Thrift and Norden rapes the attacker told the victims to participate in the act of intercourse with him. Finally, pubic hairs taken from the beds on which Thrift and Fare were raped were consistent with each other.

We believe the combined effect of all this evidence tends strongly to establish that the same man was responsible for all four of the Wendover area rapes and could, therefore, be characterized as the "Wendover rapist."

Defendant was implicated in the rape of Imbriano by direct evidence. She recognized her assailant's voice as that belonging to the man she saw outside her apartment and who said, "Oh, excuse me, I thought you were Susan." She identified defendant as the same man she saw outside her apartment at a lineup and again at trial. Because the rape of Imbriano was one of a series of rapes committed by one person, the Wendover rapist, Imbriano's identification tended to prove that defendant was that person.

This case is distinguishable from *State v. Breeden*, 306 N.C. 533, 293 S.E. 2d 788 (1982), in which we held inadmissible evidence relating to defendant's alleged commission of a crime independent of that for which he was on trial because defendant was linked to the other crime by circumstantial evidence only and not direct evidence. In that case as in this one the state was attempting to offer evidence of past criminal activity in order to identify the defendant as the perpetrator of the crime for which he was charged and in that case as in this one (except for the rape of Imbriano) the defendant was linked to the other crime by circumstantial evidence only. The two cases differ, however, with respect to the theory relied on by the state to introduce the other crimes evidence.

In *Breeden* the state argued the evidence was admissible on alternative theories, both included in *McClain*, that (1) the circumstances surrounding the commission of the crime charged and another crime are so similar that the same person committed both and (2) the crime charged and another crime are part of a common scheme or plan embracing the commission of both crimes. Even if the crime charged and another crime are so similar that one person committed both crimes or the crime charged and other crimes are part of one scheme, this fact has no tendency to prove that defendant committed the crime charged unless direct evidence links to defendant the other crimes. The theory which justifies admissibility in this case, however, does not depend on the similarity of the crime charged to the other crimes which the state seeks to introduce because the defendant by his statement, "I am the Wendover rapist," has linked the crimes charged to other crimes committed by that person. The state needed to show only that there were a series of crimes committed by one person, the Wendover rapist, and by direct evidence that defendant committed at least one of the crimes in the series. The state having

shown this, the other crimes evidence strongly tends to prove that defendant was the assailant who on 23 December identified himself as the Wendover rapist.

The dangerous tendency of this class of evidence to mislead and raise a legally spurious presumption of guilt requires that its admissibility should be subjected to strict scrutiny by the courts. *State v. McClain,* 240 N.C. 171, 177, 81 S.E. 2d 364, 368 (1954). Even relevant evidence should be excluded where the probative force is weak compared to its likelihood of playing upon the passions and the prejudices of the jury. *Pearce v. Barham,* 267 N.C. 707, 149 S.E. 2d 22 (1966);[1] The trial judge instructed the jury in this case that the state's evidence linking defendant to other rapes in the vicinity of Wendover Avenue was offered solely for the purpose of establishing the identity of defendant as the assailant of 23 December. This limiting instruction blunted to some extent the obvious potential for this evidence to excite unfair prejudice in the minds of the jury against defendant. Furthermore, the probative value of this evidence was substantial. The assailant's announcement that he was the "Wendover rapist" provided an important clue as to his identity. This clue could be unraveled only by the state's admission of evidence relating to other crimes in the Wendover area committed by defendant.

We also do not believe the admittedly strong circumstantial evidence offered by the state against defendant rendered this evidence needlessly cumulative. The identity of the assailant as noted above was the principally contended issue in this case and the state was entitled to muster all the evidence permitted by the rules of evidence to introduce to convince the jury beyond a reasonable doubt that defendant was the assailant.

---

1. This case arose before the adoption of the Rules of Evidence which codify the rule established by our cases. N.C. R. Evid. 403 provides:

"Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

N.C.G.S. § 8C-1, Rule 403 (Cum. Supp. 1985).

### III.

[2] Defendant also assigns error to the trial court's refusal to excuse juror Letitia Miller for cause on the ground there was a "possibility" that sympathy she felt towards the victim as a result of feelings for her own daughter would prevent her from reaching a fair and impartial verdict. Defendant moved to have juror Miller excused for cause on the bases of the responses given by her to the following questions posed by defense counsel:

Q. Would it be fair to say that based on your considerations regarding your daughter and your granddaughter, those feelings might or could interfere in your ability to be fair to the defendant in this case?

A. I can't tell you. I just don't know.

Q. Okay. I'm not asking for a dead solid prediction, Mrs. Miller. What I am asking is that based on your feelings, is it a reasonable possibility?

A. It is possible.

Q. Okay. What I am hearing you say is that because of your feelings about your daughter, that there exists a possibility that you could not be fair in this case to this defendant. Is that right?

A. I would try, but I could not—I would try, but I can't—I just don't know what my reaction will be.

Q. I understand. All I'm asking is, is that a reasonable possibility under the circumstances?

A. It is a possibility.

The trial court denied defendant's challenge to juror Miller for cause. Defendant at that time chose not to use one of his remaining peremptory challenges to exclude Ms. Miller. After defendant exhausted his peremptory challenges, he requested an additional peremptory challenge stating he would use it to remove Ms. Miller. When this request was denied, defendant made a second motion challenging juror Miller for cause which the trial court again denied.

The state argues defendant failed to preserve for appellate review the challenge to juror Miller for cause. We agree. N.C.G.S. § 15A-1214(h) and (i) provide:

(h) In order for a defendant to seek reversal of the case on appeal on the ground that the judge refused to allow a challenge made for cause, he must have:

(1) Exhausted the peremptory challenges available to him;

(2) Renewed his challenge as provided in subsection (i) of this section; and

(3) Had his renewal motion denied as to the juror in question.

(i) A party who has exhausted his peremptory challenges may move orally or in writing to renew a challenge for cause previously denied if the party either:

(1) Had peremptorily challenged the juror; or

(2) States in the motion that he would have challenged that juror peremptorily had his challenges not been exhausted.

The judge may reconsider his denial of the challenge for cause, reconsidering facts and arguments previously adduced or taking cognizance of additional facts and arguments presented. If upon reconsideration the judge determines that the juror should have been excused for cause, he must allow the party an additional peremptory challenge.

The question raised by defendant's assignment of error is whether in order to preserve his right to appeal an unsuccessful challenge of a juror for cause, a defendant who has peremptory challenges must use one of them to remove the challenged prospective juror.

The statute provides an unambiguous affirmative answer to this inquiry. Subsection (h)(2) requires that the disallowed challenge for cause be renewed as provided in subsection (i). Subsection (i), in turn, provides that the disallowed challenge for cause may be renewed "orally or in writing" by a party who has exhausted peremptories if either of two conditions exist. The first condition is that the party "had peremptorily challenged the person." (i)(1).[2] Clearly that condition is not met here. The second condition is that the party states in his renewal motion that he "would have challenged that juror peremptorily had his challenges not been exhausted." (i)(2). The verb tense in subsection

2. All remaining statutory references in this section will be to subsections of N.C.G.S. § 15A-1214.

(i)(2) refers to a time before the renewal motion is made; it does not refer to the time at which the renewal is being made. Had the legislature intended to refer to the time at which the motion is being made, subsection (i)(2) would read: "States in the motion that he would challenge the juror peremptorily were his challenges not then exhausted." We think it clear that subsection (i)(2) refers back to the time at which the unsuccessful challenge for cause was made. It contemplates a situation where there were no peremptories available at that time.

Reading subsections (i)(1) and (i)(2) together, they require a party who has peremptory challenges available when a challenge for cause is denied then to exercise a peremptory to remove the unwanted juror. A party who fails to do so cannot thereafter bring himself within either subsection (i)(1) or (i)(2).

Since defendant had a peremptory challenge available to him at the time he challenged juror Miller for cause but did not use it, he has not preserved the ruling on the challenge for cause for appellate review. Defendant's assignment of error is overruled.

IV.

[3]   Defendant's final two assignments of error relate to the trial court's instructions to the jury. Defendant contends the trial court committed reversible error by instructing the jury that "vaginal intercourse" is defined to be penetration, however slight, of the female *sex organ* by the male sex organ rather than as defendant requested: "the slightest penetration of the female *vagina* by the male sex organ." (Emphasis added.)

Before 1980 the law defined the penetration required for commission of the offense of rape as the slightest penetration of the female sex organ by the male sex organ. The statute defined rape in the following manner:

§ 14-21. Punishment for rape.—Every person who is convicted of ravishing and carnally knowing any female of the age of twelve years or more by force and against her will, or who is convicted of unlawfully and carnally knowing and abusing any female child under the age of twelve years, shall suffer death: Provided, if the jury shall so recommend at the time of rendering its verdict in open court, the punishment

shall be imprisonment for life in the State's prison, and the court shall so instruct the jury.

N.C.G.S. § 14-21 (repealed 1979). Case law interpreted this statutory language as follows:

'The terms "carnal knowledge" and "sexual intercourse" are synonymous. There is "carnal knowledge" or "sexual intercourse" in a legal sense if there is the slightest penetration of the sexual organ of the female by the sexual organ of the male. It is not necessary that the vagina be entered or that the hymen be ruptured; the entering of the vulva or labia is sufficient. G.S. 14-23; *S. v. Monds*, 130 N.C. 697, 41 S.E. 789; *S. v. Hargrave*, 65 N.C. 466; *S. v. Storkey*, 63 N.C. 7; Burdick: Law of Crime, section 477; 44 Am. Jur., Rape, section 3; 52 C.J., Rape, sections 23, 24.' *S. v. Bowman*, 232 N.C. 374, 61 S.E. 2d 107; *S. v. Reeves*, 235 N.C. 427, 70 S.E. 2d 9.

*State v. Jones*, 249 N.C. 134, 136-37, 105 S.E. 2d 513, 514-15 (1958). In 1979 the legislature enacted N.C.G.S. § 14-27.2 which, repealing § 14-21, defines first degree rape as follows:

(a) A person is guilty of rape in the first degree if the person engages in vaginal intercourse:

(1) With a victim who is a child of the age of 12 years or less and the defendant is of the age of 12 years or more and is four or more years older than the victim; or

(2) With another person by force and against the will of the other person, and:

a. Employs or displays a dangerous or deadly weapon or an article which the other person reasonably believes to be a dangerous or deadly weapon; or

b. Inflicts serious personal injury upon the victim or another person; or

c. The person commits the offense aided and abetted by one or more other persons.

N.C.G.S. § 14-27.2 (1981). Defendant contends that "vaginal intercourse" requires penetration of the vaginal canal and mere pene-

tration of the female genitalia no longer is sufficient penetration to constitute rape.

We do not believe the legislature intended to alter the penetration required for the offense of rape when it enacted N.C.G.S. § 14-27.2. That statute was a part of a statutory reform in which the legislature created the statutory crime of "sexual offense." N.C.G.S. § 14-27.4 provides:

> (a) A person is guilty of a sexual offense in the first degree if the person engages in a sexual act:
>
> (1) With a victim who is a child of the age of 12 years or less and the defendant is of the age 12 years or more and is four or more years older than the victim; or
>
> (2) With another person by force and against the will of the other person, and:
>
> > a. Employs or displays a dangerous or deadly weapon or an article which the other person reasonably believes to be a dangerous or deadly weapon; or
> >
> > b. Inflicts serious personal injury upon the victim or another person; or
> >
> > c. The person commits the offense aided and abetted by one or more other persons.

N.C.G.S. § 14-27.1 states that, " 'sexual act' means cunnilingus, fellatio, analingus, or anal intercourse, but does not include vaginal intercourse." The intent of the legislature when it employed the term "vaginal intercourse" in N.C.G.S. § 14-27.2 was not to change the traditional elements of rape but to distinguish that offense from other sexual offenses now included within N.C.G.S. § 14-27.4. Several cases decided under N.C.G.S. § 14-27.2 have stated that "vaginal intercourse" in a legal sense means the slightest penetration of the sexual organ of the female by the sexual organ of the male. *State v. Brown*, 312 N.C. 237, 244-45, 321 S.E. 2d 856, 861 (1984); *State v. Robinson*, 310 N.C. 530, 533-34, 313 S.E. 2d 571, 574 (1984); *State v. Stanley*, 310 N.C. 353, 366, 312 S.E. 2d 482, 490 (1984).

[4] Although the trial court did not err in instructing the jury with respect to the penetration required for the offense of rape, the court did err in failing to instruct the jury on attempted first

degree rape with respect to Sonia Hasbun because there was conflicting evidence of penetration in her case. A trial court must submit a lesser included offense instruction if the evidence would permit a jury rationally to find defendant guilty of the lesser offense and acquit him of the greater. *State v. Strickland,* 307 N.C. 274, 286, 298 S.E. 2d 645, 654 (1983). Instructions pertaining to attempted first degree rape as a lesser included offense of first degree rape are warranted when the evidence pertaining to the crucial element of penetration conflicts or when, from the evidence presented, the jury may draw conflicting inferences. *State v. Brown,* 312 N.C. 237, 244, 321 S.E. 2d 856, 861; *State v. Wright,* 304 N.C. 349, 353, 283 S.E. 2d 502, 505 (1981).

On direct examination Sonia Hasbun testified that she complied with the assailant's instructions to put his penis into her vagina. After four or five seconds the man got off of her. Hasbun testified that the second time the man came to her, she again put his penis in. Hope Untener also testified that Hasbun twice put the assailant's penis inside Hasbun's vagina.

On cross-examination, however, Hasbun testified that on the morning she was raped, she gave to the police a written statement in which she said, regarding the assailant's first attack, that the man "tried to push it in but couldn't" and that "[h]e tried for maybe fifteen seconds." She said that with respect to the second attack "he tried to penetrate me again" and "[h]e told me to put it in, and I said 'I have.' He tried to get it in but couldn't." Hasbun further testified that everything she told the police after the attack was still correct except that she had been in her bedroom rather than the kitchen when the intruder appeared. Dr. Edward Wase, who examined Hasbun at the hospital, testified that the entrance to Hasbun's vagina was very narrow, admitting only one finger when the vagina of a normal married female would admit two fingers easily. He testified that Hasbun told him she "felt pressure but not penetration" and she was uncertain whether there had been penetration or not. This evidence creates a conflict as to whether penetration occurred which should have been resolved by the jury under appropriate instructions.

The trial court, therefore, committed reversible error by failing to instruct the jury on the lesser included offense of attempted first degree rape with respect to Sonia Hasbun. That the jury

convicted defendant of first degree rape which required it to find penetration does not render the error harmless. The admitted instruction deprived defendant of his right to have the jury consider attempted first degree rape as a possible verdict in addition to the permissible verdicts of guilty or not guilty of first degree rape. "Where one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of *some* offense, the jury is likely to resolve doubts in favor of conviction." *State v. Strickland*, 307 N.C. at 286, 298 S.E. 2d at 654, *quoting Beck v. Alabama*, 447 U.S. 625, 635, 65 L.Ed. 2d 392, 401 (1980).

Defendant must therefore receive a new trial on the charge of first degree rape of Sonia Hasbun. We find no error in defendant's other convictions and the judgments based thereon.

Case No. 83CRS86775—No error.

Case No. 83CRS86781—No error.

Case No. 83CRS86782—New trial.

Case No. 83CRS86783—No error.

Case No. 83CRS86784—No error.

Case No. 83CRS86785—No error.

Justice BILLINGS took no part in the consideration or decision of this case.