An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-578

Filed 16 July 2025

New Hanover County, Nos. 21CRS056024-640, 21CRS056025-640

STATE OF NORTH CAROLINA

v.

JAMES DONELLE GAUSE

Appeal by defendant from judgment entered 26 July 2023 by Judge Clinton D. Rowe in New Hanover County Superior Court. Heard in the Court of Appeals 12 June 2025.

*Attorney General Jeff Jackson, by Special Deputy Attorney General Ellen A. Newby, for the State.*

*Carolina Law Group, by Kirby H. Smith, III, for defendant-appellant.*

ARROWOOD, Judge.

James Donelle Gause ("defendant") appeals from judgment entered 26 July 2023 upon his conviction of: (1) two counts of statutory rape of a child 15 years of age or less; (2) two counts of indecent liberties with a minor; (3) two counts of incest; and (4) two counts of statutory sex offense. On appeal, defendant argues: (1) the trial court erred by denying defendant's motion to dismiss the charges against

him and (2) defendant was denied his constitutional right to a unanimous jury verdict on all charges. For the following reasons, we find no error.

## I. Background

The evidence at trial tended to show the following:

Natasha[1] was born on 3 March 2007 to defendant and Aisha Jones ("Ms. Jones"). Natasha was one of twelve siblings and three of her siblings, Zoey, Quincy, and Quentin were also the biological children of defendant and Ms. Jones. After Ms. Jones passed away in 2015, Natasha and her three siblings briefly lived with their aunt and grandmother, and later went to live with defendant.

In 2020, Natasha was living with defendant and his wife, Shana Robinson ("Ms. Robinson"). The family lived in a two-bedroom, two-bathroom apartment where defendant and Ms. Robinson slept in one bedroom and all four of defendant's children slept in the other bedroom. Defendant worked as a supervisor floor technician on both day and night shifts and Ms. Robinson worked in the mornings as a cook.

In 2020, Natasha was suspended from school for hitting her teacher. After she was suspended, she went back to defendant's home and she was fearful defendant was going to punish her. When Natasha returned home, she testified that defendant started pulling down her pants and although she did not remember most of the events, she remembers him putting his hand in her vagina and putting his penis in

---

[1] Pseudonyms are used to protect the identity of the juveniles.

her vagina.  Natasha stated that she told defendant to stop during this incident.  This event took place during the day when Ms. Robinson was at work and Natasha's other siblings were in school.  After defendant penetrated Natasha vaginally, Natasha testified that she found blood around her vagina.  After this event, defendant took Natasha to a convenience store where he bought her some chips and a drink before going back to their home.

On a separate occasion, Natasha was standing in the corner of the living room located near defendant's bedroom as punishment for actions earlier that evening. Natasha's other siblings and defendant were also in the room while Natasha was standing in the corner.  Defendant told Natasha's other siblings to go to bed. Defendant also told Natasha to go to bed and Natasha left the corner to give him a hug. While Natasha was hugging defendant, defendant took Natasha to the couch in the living room, put his hands down Natasha's pants, pulled off her underwear, and "started raping" her.  Natasha told defendant to stop multiple times and defendant only stopped after she pushed him off her.  After this event, defendant took Natasha to a gas station and bought her chips and a drink again.  After returning home, defendant told Natasha not to tell anyone about what he did.

Finally, on the day of Ms. Robinson's birthday, Ms. Robinson and Zoey left the home.  Natasha's other two siblings were in the living room.  Defendant had told Natasha to stand in the corner as punishment.  Defendant took Natasha up to her room and proceeded to take off his clothes and Natasha's clothes and rape her.

Natasha testified that defendant "kept looking out the [bedroom] door to see if anybody was looking." Defendant only stopped when Natasha started crying and telling him to stop.

Natasha had previously told Quentin about defendant raping her on two separate occasions, so Quentin kept close watch on Natasha and defendant. Natasha later told Zoey about defendant's actions after she told Quentin. Natasha asked both Zoey and Quentin not to tell anyone about what she told them because she did not want to "break the family apart." Furthermore, sometime around Natasha's birthday in 2021, Ms. Robinson set up security cameras around the home after Quentin hit Natasha. Natasha testified that defendant had not sexually assaulted her after the cameras were installed in the home.

In early June 2021, Natasha went to a laundromat with defendant. While at the laundromat, defendant received a call from Ms. Robinson, after which both Natasha and defendant returned to their home. On the way there, defendant told Natasha not to say anything to anyone at the home. When they arrived at defendant's home, defendant started hitting Quentin while Quentin yelled "You raped my sister." According to Natasha, this was the first time Ms. Robinson heard the allegation.

After this altercation, Ms. Robinson took Natasha to the hospital to determine if Natasha was sexually active at the time. Although the hospital never conducted an exam, Natasha testified that she did not have a boyfriend at the time and had not been sexually active apart from what defendant had done to her. A few weeks later,

Natasha told her grandmother about the incidents. That same day, the grandmother called the police, and the police, along with representatives from Hanover County Department of Social Services ("DSS") arrived at defendant's house. DSS told the parties involved that the four children could either stay with the grandmother and defendant could remain at his home or the children could remain at the home and defendant would need to find some other place to stay. The children elected to stay with the grandmother. Throughout these events, Natasha told Ms. Robinson several times that she made these allegations as "a prank" and that she "had made it up[.]"

On 27 July 2021, Ms. Robinson took Natasha to the Carousel Center, a nationally recognized child advocacy center, for an examination. Gina Solari ("Ms. Solari") conducted a child medical evaluation on Natasha, which includes a forensic interview and a medical evaluation. During the forensic interview, Natasha stated that she had been digitally penetrated in her vagina and also reported penile penetration to her vagina on multiple occasions. Kelly Ezzell ("Ms. Ezzell"), a nurse practitioner at the Carousel Center, conducted the medical examination on Natasha. As part of this examination, Ms. Ezzell asked Natasha if she was concerned with anything in particular, to which Natasha replied that she "had quite a few anxieties specifically regarding sexually transmitted diseases." Furthermore, during Natasha's physical examination, Ms. Ezzell noticed a "deep notch in her hymen" which is "consistent with the medical diagnosis of sexual abuse." Ms. Ezzell also stated that she had previously examined Natasha in 2017, during which her medical

examination came back normal with no evidence of abuse.

On 11 October 2021, defendant was indicted in two separate indictments. The first indictment charged defendant with four offenses that allegedly took place during 2020: (1) statutory rape of a child under the age of 15; (2) indecent liberties with a child; (3) incest with a child of age 13/14/15; and (4) statutory sex offense with a child under the age of 15. The second indictment charged defendant with three offenses that took place between 1 January 2021 and 7 June 2021: (1) felony statutory rape of a child under the age of 15; (2) indecent liberties with a child; and (3) incest with a child age 13/14/15. Trial for defendant's indictments commenced on 24 July 2023. At the start of trial, the State stipulated that Natasha had made prior accusations of sexual assault from her teacher that she later recanted.

During trial, Zoey testified mostly in a corroborative capacity. Zoey corroborated Natasha's account of the events in early June 2021. Zoey further corroborated that Natasha did not have a boyfriend at the time. After the close of the State's case, defendant moved to dismiss each of the charges against him for insufficient evidence. The trial court initially denied defendant's motion to dismiss as to the first three offenses he was charged for. In regard to the motion to dismiss the statutory sex offense with a child under the age of 15, the trial court took the matter under advisement.

The following day, defendant testified in his own defense. Defendant testified that Natasha had previous problems with violence and bullying. He further stated

his belief that Natasha was making up her allegations because she wanted to move away from defendant to Virginia.

At the close of evidence, the trial court denied defendant's motion to dismiss the statutory sex offense charge. After this denial, defendant renewed his motion to dismiss for the same reasons cited earlier. The trial court again denied this motion. During closing arguments, the State argued that although defendant had only been charged with two counts of statutory rape, evidence was presented for three different instances for statutory rape. The State further argued that although evidence of more than two instances of statutory rape was presented, the jury must come to a unanimous verdict and that each instance must be separate and distinct from one another while they deliberate on the charges. Finally, the State argued:

> Because Ms. Solari talked to you about how memories blend in, right. Because Mr. Ashworth made a big deal in his closing argument about, well, she's inconsistent, we don't know when the first time was, we don't know what really happened with the first time was, we don't know what the second time was or the third time was because it keeps changing, right.
>
> But we already know that that's how your mind works when you've been sexually assaulted multiple times and you're a child. You do not have to agree on a specific time. All you have to agree is that there was improper sexual conduct.
>
> So if four of you think, well, yep, he raped her once on the couch and once on the bed, and some of you say, well, no, I think he only raped her twice on the bed, but it didn't happen on the couch, as long as all 12 of you agree that he raped her twice, he's guilty of statutory rape, incest, and

*Opinion of the Court*

> indecent liberties.
>
> Same thing with a statutory sex offense. Oh, and this is
> from a case, this is from our North Carolina Supreme
> Court. I'm just not making this up, right. Same with the
> statutory sex offense. If you think that he only -- if some of
> you think he digitally penetrated her in her room, some of
> you think he digitally penetrated her in his bedroom, and
> only some of you think, well, I only based upon my review
> of the evidence I think it only happened on the couch, as
> long as all 12 of you agree that it at least happened one
> time, he's guilty.

Defendant's counsel did not object to these statements.

After closing arguments, the trial court provided separate jury instructions for all seven of the charges for which defendant was indicted. Furthermore, the trial court stated that all twelve jurors must agree to the verdict and that once they "have agreed upon unanimous verdicts as to each charge," the verdict form must be filled out and returned. After the jury charge, the trial court sent the jury back for deliberations with verdict sheets detailing each of the offenses defendant was charged with. Neither of the verdict sheets contained dates of the alleged offenses but did list out the separate case numbers that matched the indictment. After deliberations, the jury found defendant guilty of all charges. Defendant entered oral notice of appeal on 26 July 2023.

## II.    Discussion

On appeal, defendant argues: (1) the trial court erred by denying defendant's motions to dismiss the charges against him and (2) defendant was denied his

constitutional right to a unanimous jury verdict on all charges. We address each argument in turn.

### A. Motion to Dismiss

Defendant first argues the trial court erred in denying defendant's motion to dismiss the charges against him. Specifically, defendant argues there was insufficient evidence to show what definition of "rape" Natasha was using when she testified that defendant "started raping" her. Furthermore, defendant argues the State did not offer any evidence to show that defendant committed a sexual act on Natasha. We disagree.

### 1. Standard of Review

Our "Court reviews the trial court's denial of a motion to dismiss *de novo*." *State v. Smith*, 186 N.C. App. 57, 62 (2007) (citation omitted). "Upon defendant's motion for dismissal, the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense. If so, the motion is properly denied." *State v. Fritsch*, 351 N.C. 373, 378 (2000). Substantial evidence exists if there "is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Smith*, 300 N.C. 71, 78–79 (1980). "In making its determination, the trial court must consider all evidence admitted, whether competent or incompetent, in the light most favorable to the State, giving the State the benefit of every reasonable inference and resolving any contradictions

in its favor." *State v. Rose*, 339 N.C. 172, 192–93 (1994) (citation omitted).

### 2. Statutory Rape

Defendant first argues there was insufficient evidence to show that defendant engaged in vaginal intercourse with Natasha. Specifically, defendant argues that Natasha testifying that defendant raped her is insufficient to prove that defendant engaged in vaginal intercourse with Natasha because there are varied definitions of rape North Carolina and federal courts have relied on. We disagree.

Under N.C.G.S. § 14-27.25,

> [a] defendant is guilty of a Class B1 felony if the defendant engages in vaginal intercourse with another person who is 15 years of age or younger and the defendant is at least 12 years old and at least six years older than the person, except when the defendant is lawfully married to the person.

N.C.G.S. § 14-27.25 (2024). It is undisputed that Natasha was under the age of 15 during the dates of all three instances of rape. Furthermore, it is undisputed that Natasha and defendant were not married.

Defendant argues that because North Carolina Courts and other federal legal bodies use differing definitions of "rape," the State did not provide sufficient evidence to prove that when Natasha testified that defendant "raped" her, she meant vaginal intercourse occurred. However, in *State v. Kitchengs*, this Court held that "a prosecuting witness is not required to use any particular form of words to indicate that penetration occurred." *State v. Kitchengs*, 183 N.C. App. 369, 375 (2007).

Rather, this Court "permit[s] a wide range of testimony to indicate penetration." *Id.* at 375–76.

When a young child is testifying, this Court has previously upheld a denial of a motion to dismiss when a victim's testimony did not include words such as "penis" or "vagina" and did not include any scientific accuracy as to the acts that occurred. *State v. Summers*, 92 N.C. App. 453, 456 (1988) (holding that an eleven-year-old victim testifying that defendant "put his 'private' in her 'private' between her legs" was sufficient to uphold a denial of a motion to dismiss). Finally, our Supreme Court has held that a jury may infer that a victim is referring to sexual intercourse in their testimony where there is other evidence of sexual abuse. *State v. Moses*, 316 N.C. 356, 359 (1986).

Here, Natasha provided sufficient testimony to support a conclusion that vaginal intercourse occurred. Natasha used similar language as the victim in *Summers* to describe all three incidents between Natasha and defendant. Natasha initially testified:

> Q: So when you say that he touched you, what body part of his touched what body part of yours?
>
> A: His private part touched my private part, basically.
>
> Q: Okay. Did that happen one time, or did that happen more than one time?
>
> A: More than one time.
>
> Q: Okay. And other than his private part touching your

private part, did he do anything else to your body that made you feel uncomfortable?

A: Yes. He touched me with like his hand in my private part.

Q: Okay. And so, there's different people that use the term private part for different body parts.

A: Okay.

Q: So when you're talking about private part, what private part of yours are you talking about?

A: My vagina.

Q: And when you're talking about his private part, what body part of his are you talking about?

A: His penis.

Natasha went on to further testify that during the first incident in 2020, defendant "put his penis in [her] vagina." This testimony exhibits that Natasha understood she was testifying that vaginal penetration occurred during this first incident. Defendant concedes in his brief that Natasha's description of this first event "described sexual intercourse."

The State went on to ask, "And you said that that happened on the bed. Did it ever happen anywhere else in your house?" In response to this question, Natasha testified that it had happened again and stated: "[defendant] pulled down my underwear. And he pulled down his underwear and he started raping me." Finally, the State, referencing defendant raping Natasha, then asked "Was there a time it

happened on your bed on your stepmother's birthday?" Natasha responded that "it" had happened and described that defendant "took off his pants. And he raped me and he kept looking out the door [of the bedroom] to see if anybody was looking."

This testimony demonstrates that Natasha understood that when she used the word "rape" in her testimony, she was referring to penetration, particularly because she discussed how defendant would remove both her underwear and his underwear before raping her. Given her age, Natasha did not need to describe penetration with scientific accuracy for the trial court to determine that sexual intercourse occurred. Natasha's testimony, coupled with testimony from medical professionals at the Carousel Center that Natasha had a "deep notch in her hymen" which is "consistent with the medical diagnosis of sexual abuse," support a finding that Natasha suffered from sexual abuse at a result of defendant's actions.

Furthermore, initially in her testimony, Natasha stated that when she was discussing defendant's "private part," she was discussing his penis. Natasha later stated that defendant put his penis in her vagina when describing the first instance of statutory rape. When prompted by the State to discuss times where "it" happened again, she described two more instances where defendant raped her.

Thus, this testimony, taken in a light most favorable to the State, was sufficient to show that when Natasha was describing that defendant "raped" her, she was discussing penetration. Accordingly, the trial court did not err in dismissing defendant's motion to dismiss the statutory rape charges and associated charges of

incest and indecent liberties with a minor.

### 3. Statutory Sex Offense

Defendant further argues the trial court erred in denying his motion to dismiss the charge of statutory sex offense with a minor because there was insufficient evidence of digital penetration. Specifically, defendant argues that Natasha provided inconsistent testimony at trial with what she said during her interview with the Carousel Center. Furthermore, defendant argues the State provided insufficient evidence that any penetration occurred by merely showing that defendant only touched Natasha's vagina. We disagree.

N.C.G.S. § 14-27.30 states:

> A defendant is guilty of a Class B1 felony if the defendant engages in a sexual act with another person who is 15 years of age or younger and the defendant is at least 12 years old and at least six years older than the person, except when the defendant is lawfully married to the person.

N.C.G.S. § 14-27.30 (2024). As stated above, there is no dispute that Natasha was 13 to 14 years old when these acts occurred and defendant and Natasha were never married. A "sexual act" is defined as "[c]unnilingus, fellatio, analingus, or anal intercourse, but does not include vaginal intercourse. Sexual act also means the penetration, however slight, by any object into the genital or anal opening of another person's body." N.C.G.S. § 14-27.20(4) (2024). Our Supreme Court has previously held that "entering of the vulva or labia is sufficient" to find penetration. *State v. Johnson*, 317 N.C. 417, 433 (1986). This interpretation was further affirmed in *State*

*v. Bellamy*, where this Court held that a finding that defendant entered the labia is sufficient to show sexual offense. *State v. Bellamy*, 172 N.C. App. 649, 658 (2005).

Here, Natasha provided sufficient testimony to show that defendant digitally penetrated her with his hand. First, Natasha testified that when she used the term "private part," she was discussing her vagina and defendant's penis. Second, Natasha clearly testified that defendant "touched [her] with like his hand in [her] private part," and further testified that he touched her under her clothes. Finally, during trial, Ms. Ezzell testified that Natasha reported digital vaginal penetration to the Carousel Center, which was consistent with her testimony at trial as well.

Thus, this evidence, taken in a light most favorable to the State, demonstrates that the State presented sufficient evidence to support a conclusion that defendant digitally penetrated Natasha at least on one occasion. Accordingly, we hold the trial court did not err in denying defendant's motion to dismiss the charge of statutory sex offense against him.

### B.     Unanimous Jury Verdict

Defendant further argues he was denied his constitutional right to a unanimous jury verdict on all charges because the State presented evidence of three instances of statutory rape when defendant was only charged with two counts of statutory rape. Specifically, defendant argues the State did not distinguish which incidents applied to each charge and thus, the jury was unable to unanimously agree on which incident to convict him of statutory rape for. In response, the State argues

that defendant failed to preserve this argument for appeal. We address each argument separately below.

### 1.    Preservation

The State argues that although defendant characterizes this issue as a constitutional violation, defendant is actually appealing statements made during the State's closing arguments. The State also argues that because defendant's counsel never objected to certain statements made during the State's closing arguments, the issue of a unanimous jury verdict is not preserved for appeal. We disagree.

> Generally, a failure to object to an alleged error of the trial court precludes the defendant from raising the issue on appeal. However, violations of constitutional rights, such as the right to a unanimous verdict, . . . are not waived by the failure to object at trial and may be raised for the first time on appeal.

*State v. Davis*, 214 N.C. App. 175, 179 (2011). In *Davis*, the defendant there raised a similar issue in which the defendant was charged with five counts of statutory rape, but the indictment "lacked the specific details necessary to link them to specific acts and incidents." *Id.* at 180. In that case, this Court treated the issue of whether or not a unanimous jury verdict was reached on these five charges as a constitutional issue, thus preserving the issue for appeal. *Id.*

Here, defendant makes a similar argument, stating that because defendant was only charged with two counts of statutory rape, but the State presented evidence on three separate incidents, the indictment was not detailed enough to inform the

jury of which incident matched which count in the indictment. Thus, because this issue surrounds unanimity of a jury verdict, this issue is preserved for appeal.

## 2. Specificity of Indictments

Defendant argues his right to a unanimous jury verdict was violated because the indictments charged defendant with two counts of statutory rape and two counts of incest, but three instances of statutory rape and incest were presented to the jury. Defendant makes a similar argument stating he was only charged with one count of statutory sex offense, but the State presented evidence of two incidents of statutory sex offense. Thus, defendant argues, the jury was unable to unanimously agree on which incident of statutory rape and statutory sex offense was the offense defendant was charged with in the indictment. We disagree.

Our Supreme Court has previously addressed the issue of when there is a discrepancy between the number of incidents shown through evidence presented at trial and the number of offenses a defendant has been charged with in *State v. Massey*. In that case, our Supreme Court held:

> although the evidence showed a greater number of incidents committed by the defendant than the number of offenses with which he was charged and convicted, no jury unanimity problem existed regarding the convictions because, "while one juror might have found some incidents of misconduct and another juror might have found different incidents of misconduct, the jury as a whole found that improper sexual conduct occurred.

*State v.* Massey, 361 N.C. 406, 408 (2007) (quoting *State v. Markeith Lawrence*, 360

N.C. 368, 374 (2006)).  Furthermore, in *Wiggins*, this Court did not find a unanimity issue where the trial court, during the jury charge, differentiated each incident by case number and submitted separate verdict sheets to the jury.  *State v. Wiggins*, 161 N.C. App. 583, 592–93 (2003).

Here, defendant received two separate indictments, each charging defendant with one count of statutory rape and one indictment charging defendant with one count of statutory sexual offense.  In one indictment, defendant was charged with one count of statutory rape that occurred sometime during the year 2020.  However, the State presented evidence of two instances of statutory rape during 2020. Furthermore, the State in its closing arguments stated

> So if four of you think, well, yep, he raped her once on the couch and once on the bed, and some of you say, well, no, I think he only raped her twice on the bed, but it didn't happen on the couch, as long as all 12 of you agree that he raped her twice, he's guilty of statutory rape, incest, and indecent liberties.

Defendant argues that the indictment, evidence presented during trial, and statements made by the State during closing arguments contributed to jury confusion as to which offense matched the charge on the indictment.

However, during the jury charge, the trial court instructed the jury separately on each count, including repeating the instruction on statutory rape, incest, and indecent liberties twice.  Additionally, for all seven charges, the trial court stated several times that the jury must find "evidence beyond a reasonable doubt that on or

about the alleged date . . ." each element is met. The trial court also explicitly stated that all twelve jurors must agree to the verdict and that once they "have agreed upon unanimous verdicts as to each charge," the verdict form must be filled out and returned. Second, on the verdict sheets, each sheet is listed with separate case numbers at the top to differentiate that the charges are from separate dates. These verdict sheets, just like the verdict sheets in *Wiggins*, are sufficient to differentiate the instances in which the jurors are deciding to convict the defendant for.

Thus, the separate indictments, jury charge, and separate verdict sheets mitigate any issues related to a unanimous verdict. Although there is a discrepancy in the counts charged and the number of instances provided as evidence, because the jury as a whole found that one count of statutory rape occurred during 2020, one count of statutory rape occurred between 1 January 2021 and 7 June 2021, and one count of statutory sex offense occurred in 2020, under the holding in *Massey*, no jury unanimity issue exists in this case.

Defendant alternatively argues the trial court should have intervened *ex mero motu* during the State's closing arguments when the State argued that

> So if four of you think, well, yep, he raped her once on the couch and once on the bed, and some of you say, well, no, I think he only raped her twice on the bed, but it didn't happen on the couch, as long as all 12 of you agree that he raped her twice, he's guilty of statutory rape, incest, and indecent liberties.

Counsel "are given wide latitude in arguments to the jury and are permitted

to argue the evidence that has been presented and all reasonable inferences that can be drawn from that evidence." *State v. Richardson*, 342 N.C. 772, 792–93 (1996). "Only an extreme impropriety on the part of the prosecutor will compel this Court to hold that the trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument that defense counsel apparently did not believe was prejudicial when originally spoken." *State v. Anthony*, 354 N.C. 372, 428 (2001) (internal citations omitted).

Here, the State did not make statements that were so improper during its closing arguments to require the trial judge to intervene on its own motion. As stated in *Massey*, a jury is allowed to consider more instances of statutory rape or statutory sexual offense than the number of charges on the indictment. Additionally, the trial court, in its jury charge, instructed the jury on unanimity and that a verdict form could only be returned when all twelve jurors agreed on each of the seven charges. Thus, the trial court did not err in failing to intervene *ex mero motu* during the State's closing arguments.

### III. Conclusion

For the foregoing reasons, we find no error.

NO ERROR.

Judges WOOD and FLOOD concur.

Report per Rule 30(e).

- 20 -