STATE OF NORTH CAROLINA v. LAWRENCE DONELL FLOOD, SR.

No. COA11-856

(Filed 19 June 2012)

**1. Evidence—prior crimes or bad acts—homicide—admission prejudicial error—knowledge—intent—victim's state of mind—Confrontation Clause**

The trial court erred in a first-degree murder, first-degree kidnapping, and possession of a firearm by a felon case by allowing the admission of evidence of facts surrounding a prior homicide committed by defendant. With respect to knowledge and intent, the probative value of the facts surrounding the prior shooting was outweighed by the danger of undue prejudice. Further, whether a victim was fearful and pled for his life showed the victim's state of mind and did not reflect on the perpetrator. Finally, the testimony that defendant objected to on Confrontation Clause grounds involved facts of the prior shooting that were not sufficiently similar to this shooting.

**2. Evidence—prior crimes or bad acts—improper admission of prior homicide—new trial**

It was for the jury to decide the weight and credibility of all the evidence in a first-degree murder, first-degree kidnapping, and possession of a firearm by a felon case, and it could not be said that absent the improper admission of the facts surrounding a prior homicide committed by defendant that there was no reasonable possibility that a different result would have been reached at trial. The case was reversed and remanded for a new trial.

Appeal by Defendant from judgments entered 16 December 2009 by Judge J.B. Allen, Jr. in Superior Court, Alamance County. Heard in the Court of Appeals 10 January 2012.

*Attorney General Roy Cooper, by Assistant Attorney General Mary Carla Hollis, for the State.*

*Appellate Defender Staples Hughes, by Assistant Appellate Defender Anne M. Gomez, for Defendant.*

McGEE, Judge.

STATE v. FLOOD

[221 N.C. App. 247 (2012)]

Jerrod Watlington (Watlington) was shot and killed on 11 August 2007 (the 2007 shooting). Evidence presented at trial showed that Watlington had spent the previous night of 10 August 2011 with Lester Slade (Slade) and Jennifer Small (Small) at their house (the house). Watlington, Slade, and Small all occasionally sold illegal drugs. Evidence at trial suggested that someone came by the house on the morning of 11 August 2007 to buy crack cocaine. There was no crack at the house to sell, so Watlington offered to try to find some. Watlington called Lawrence Donell Flood, Sr. (Defendant) and left to purchase crack from Defendant. Watlington returned, saying that Defendant did not have the amount of crack needed, but that Defendant would have more later in the day.

Around lunchtime that day, Paul Lloyd (Lloyd) drove his uncle to the house to purchase crack. Watlington called Defendant several times and asked if he could purchase more crack from Defendant. Lloyd drove Watlington to Defendant's apartment at the Crescent Arms apartment complex (Crescent Arms) in Graham, in order to procure the crack. Lloyd parked five parking spaces to the right of Defendant's front door. Lloyd remained in the car while Watlington went to purchase crack from Defendant. Watlington knocked on Defendant's front door, but nobody answered, so Watlington went around to the rear of the building. Defendant's apartment was on the end of the building, the farthest to the left when looking at the front of Defendant's apartment.

At approximately 2:30 p.m., a man identified as "Rock," approached Lloyd's car and shot Lloyd twice through the driver's side window. Rock was apparently living at Defendant's apartment, though Rock's relationship to Defendant was unclear from the testimony at trial. Someone called 911 at 2:32 p.m. to report the shooting. Lloyd survived his wounds.

The two key witnesses who testified at trial were Rasheem Currie (Currie), who said he witnessed Defendant shoot and kill Watlington inside Defendant's apartment sometime between 2:00 p.m. and 3:00 p.m. that same day; and Lloyd, who placed Watlington outside Defendant's apartment and alive at a time incompatible with the theory that Defendant killed Watlington in Defendant's apartment. For the jury to convict Defendant, it had to believe Currie and disbelieve Lloyd. The only forensic evidence linking Watlington to Defendant's apartment was a small amount of Watlington's blood recovered from the outside doorframe of the rear door to Defendant's apartment, and a small amount of blood recovered from the adjoining patio area that

could possibly have come from Watlington and/or Defendant, or some unknown third party.

The State offered evidence of a shooting committed by Defendant in 1994, which Defendant moved to suppress. Defendant's motion to suppress was denied. The jury found Defendant guilty of first-degree murder on 9 December 2009, pursuant to the theory of malice, premeditation and deliberation, and pursuant to the felony murder rule. The jury also found Defendant guilty of first-degree kidnapping, and possessing a firearm after having been convicted of a felony. The jury recommended Defendant be sentenced to "life imprisonment without parole." Defendant appeals.

The dispositive issues in this case are whether the trial court erred in denying Defendant's motion to suppress and, if so, whether Defendant was prejudiced by this error. Additional relevant evidence will be discussed in the body of the opinion.

I.

[1] Defendant contends in his first argument that the trial court erred by allowing the admission of evidence of facts surrounding a prior homicide committed by Defendant. We agree.

Defendant filed a motion to exclude certain evidence relating to a 1994 homicide (the 1994 shooting) committed in New Jersey, in which Lorenzo Rue (Rue) was shot twice in the head and killed. The State sought to admit this evidence pursuant to N.C. Gen. Stat. § 8C-1, Rule 404(b). Defendant pleaded guilty in 1994 to two New Jersey felonies: "First degree, aggravated manslaughter and unlawful possession of a weapon." The fact that Defendant had been convicted of these felonies was properly admitted in support of the charge of possession of a firearm by a felon. Defendant, however, challenged the admissibility of the underlying facts of the 1994 shooting. Defendant claimed there was not sufficient admissible evidence for the jury to find that the facts underlying the 1994 shooting were sufficiently similar to the facts in the present case.

*Applicable Law*

In *State v. Carpenter*, 361 N.C. 382, 646 S.E.2d 105 (2007), our Supreme Court reviewed the law governing the admission of evidence of prior crimes or bad acts pursuant to N.C. Gen. Stat. § 8C-1, Rule 404(b):

North Carolina Rule of Evidence 404(b) provides:

(b) *Other crimes, wrongs, or acts.*—Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

We have characterized Rule 404(b) as a "general rule of *inclusion* of relevant evidence of other crimes, wrongs or acts by a defendant, subject to but *one exception* requiring its exclusion if its *only* probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged." *State v. Coffey*, 326 N.C. 268, 278–79, 389 S.E.2d 48, 54 (1990). However, we have also observed that Rule 404(b) is "consistent with North Carolina practice prior to [the Rule's] enactment." *State v. DeLeonardo*, 315 N.C. 762, 770, 340 S.E.2d 350, 356 (1986); *accord State v. McKoy*, 317 N.C. 519, 525, 347 S.E.2d 374, 378 (1986). Before the enactment of Rule 404(b), North Carolina courts followed "[t]he general rule . . . that in a prosecution for a particular crime, the State cannot offer evidence tending to show that the accused has committed another distinct, independent, or separate offense. This is true even though the other offense is of the same nature as the crime charged." *State v. McClain*, 240 N.C. 171, 173, 81 S.E.2d 364, 365 (1954) (citations omitted); *see also DeLeonardo*, 315 N.C. at 769, 340 S.E.2d at 355 ("Since *State v. McClain* . . . it has been accepted as an established principle in North Carolina that 'the State may not offer proof of another crime independent of and distinct from the crime for which defendant is being prosecuted even though the separate offense is of the same nature as the charged crime.' "). As we explained in *McClain*, the general rule "rests on these cogent reasons":

(1) Logically, the commission of an independent offense is not proof in itself of the commission of another crime.

(2) Evidence of the commission by the accused of crimes unconnected with that for which he is being tried, when offered by the State in chief, violates the rule which forbids the State initially to attack the character of the accused, and also the rule that bad character may not be proved by particular acts, and is, therefore, inadmissible for that purpose.

**STATE v. FLOOD**

[221 N.C. App. 247 (2012)]

(3) Proof that a defendant has been guilty of another crime equally heinous prompts to a ready acceptance of and belief in the prosecution's theory that he is guilty of the crime charged. Its effect is to predispose the mind of the juror to believe the prisoner guilty, and thus effectually to strip him of the presumption of innocence.

(4) Furthermore, it is clear that evidence of other crimes compels the defendant to meet charges of which the indictment gives him no information, confuses him in his defense, raises a variety of issues, and thus diverts the attention of the jury from the charge immediately before it. The rule may be said to be an application of the principle that the evidence must be confined to the point in issue in the case on trial.

240 N.C. at 173–74, 81 S.E.2d at 365–66 (citations and quotation marks omitted); *see also McKoy*, 317 N.C. at 526, 347 S.E.2d at 378. Thus, while we have interpreted Rule 404(b) broadly, we have also long acknowledged that evidence of prior convictions must be carefully evaluated by the trial court.

Accordingly, we have observed that evidence admitted under Rule 404(b) "should be carefully scrutinized in order to adequately safeguard against the improper introduction of character evidence against the accused." *State v. Al–Bayyinah*, 356 N.C. 150, 154, 567 S.E.2d 120, 122 (2002). When evidence of a prior crime is introduced, the " 'natural and inevitable tendency' " for a judge or jury " 'is to give excessive weight to the vicious record of crime thus exhibited and either to allow it to bear too strongly on the present charge or to take the proof of it as justifying a condemnation, irrespective of the accused's guilt of the present charge.' " *Id.* at 154, 567 S.E.2d at 122–23 (quoting IA John Henry Wigmore, Evidence § 58.2, at 1212 (Peter Tillers ed., 1983)). Indeed, "[t]he dangerous tendency of [Rule 404(b)] evidence to mislead and raise a legally spurious presumption of guilt requires that its admissibility should be subjected to strict scrutiny by the courts." *State v. Johnson*, 317 N.C. 417, 430, 347 S.E.2d 7, 15 (1986).

In light of the perils inherent in introducing prior crimes under Rule 404(b), several constraints have been placed on the admission of such evidence. Our Rules of Evidence require that in order for the prior crime to be admissible, it must be relevant to the currently alleged crime. N.C.G.S. § 8C–1, Rule 401 (2005). . . . . In addition, "the rule of inclusion described in *Coffey* is constrained

by the requirements of similarity and temporal proximity."
*Al–Bayyinah*, 356 N.C. at 154, 567 S.E.2d at 123. . . . Moreover, as
to the "similarity" component, evidence of a prior bad act must
constitute " 'substantial evidence tending to support a reasonable
finding by the jury that the defendant committed [a] *similar*
act.' " *Al–Bayyinah*, 356 N.C. at 155, 567 S.E.2d at 123. "Under
Rule 404(b) a prior act or crime is 'similar' if there are 'some
unusual facts present in both crimes . . . . ' " Finally, if the pro-
pounder of the evidence is able to establish that a prior bad act is
both relevant and meets the requirements of Rule 404(b), the trial
court must balance the danger of undue prejudice against the
probative value of the evidence, pursuant to Rule 403.

*Carpenter*, 361 N.C. at 386–89, 646 S.E.2d at 109–10 (some citations
omitted).

### *The 1994 Shooting*

At Defendant's suppression hearing, Jack Eutsey (Eutsey), a
detective for the Newark, New Jersey Police Department in 1994
(now retired), testified that he investigated the 1994 shooting for
which Defendant pleaded guilty. Eutsey testified that, at the time of
the 1994 shooting, Rue was twenty-two years old, and Defendant was
nineteen. Rue was having a sexual relationship with Yesenia Perez
(Perez), Defendant's girlfriend. However, Defendant and Rue did not
know each other. Eutsey testified that he did not "think [Defendant]
had knowledge of [Rue] dealing with [Perez][,]" but that Defendant
"suspected Ms. Perez of some other activities, and as a result,
[Defendant] broke into the apartment when Mr. Rue . . . was in bed
with her." Rue was unclothed at that time because he was in bed with
Perez. Eutsey testified that he knew Rue was in bed with Perez only
because Perez told him. Rue was discovered "nude, laying face down
on the bed." He had died from two gunshot wounds to the back of the
head. Eutsey testified that Perez had indicated to him that "she was
in fear from" Defendant. Perez was the sole eyewitness to the events
surrounding the 1994 shooting.

Perez's initial story concerning the 1994 shooting did not involve
Defendant. Perez first stated to police that "three black males,
unknown black males had broke in." Perez eventually told police that
Defendant had killed Rue. There was no indication the 1994 shooting
had anything to do with drugs or any drug transaction, or any robbery
attempt. Rue was killed by two shots fired from a .22 caliber handgun.
Eutsey testified that, to his best recollection, the shots that killed Rue

were fired from close range, but he could not remember if Rue's wounds were contact wounds—meaning that the barrel of the gun was touching Rue's head when the trigger was pulled. Perez told Eutsey that Rue pleaded for his life before Defendant shot him. The .22 caliber handgun used in the 1994 shooting was never recovered.

### State's evidence in the 2007 Shooting

In the case before us, Currie testified that Defendant shot Watlington one time in the back of the head. Timothy Myers (Myers), who had been in jail with Defendant, testified that Defendant had told him Watlington was crying and pleading for his life before Defendant shot him. Currie testified that he was afraid of Defendant because of the killing of Watlington. There was no evidence that Watlington was armed. The .38 caliber handgun used in the 2007 shooting was never recovered.

### The Trial Court's Ruling

The trial court ruled that evidence surrounding the 1994 shooting could be admitted pursuant to Rule 404(b) for the purposes of showing identity, intent, and knowledge. The trial court seemed to particularly rely on the *voir dire* testimony of Eutsey, and on the testimony of Myers, that indicated both Watlington and Rue were crying and begging for their lives before being shot. The trial court also stated that it found as similarities between the 1994 shooting and the 2007 shooting that neither handgun was ever recovered; that the two eyewitnesses, Perez and Currie, were both fearful of Defendant; that in both instances Defendant was armed but the victims were not; and that "it appear[ed] that Mr. Watlington had met [Defendant] on one occasion, and on the day of his death, was attempting . . . a drug deal with [Defendant]. The evidence tend[ed] to show that [Defendant's] relationship with Mr. Rue was that Mr. Rue was having sexual relations with [Defendant's] girlfriend." The trial court further found that both victims were killed with a handgun; one shot to the back of Watlington's head, and two shots to Rue's head; and that Rue was twenty-two years old when he was killed, and Watlington was sixteen years old when he was killed.

### Knowledge and Intent

We hold that the facts surrounding the 1994 shooting were not admissible to prove intent or knowledge in the 2007 shooting. The State argues that the facts surrounding the 1994 shooting were relevant to prove that Defendant had "knowledge that the weapon used

was lethal" and to prove that Defendant had the intent to kill—specifically that Watlington did not die as the result of an accident. Watlington was killed when a .38 caliber handgun was placed against the back of his head and fired. Clearly the person who committed that act knew it was lethal, and was intended to kill. Whatever slight relevance the 1994 shooting may have had with respect to knowledge and intent in the 2007 shooting, the probative value of this evidence was minimal at best, and the potential for prejudice was great. With respect to knowledge and intent, the probative value of the facts surrounding the 1994 shooting was outweighed by the danger of undue prejudice. N.C.R. Evid. 403. Whether evidence from the 1994 shooting was admissible pursuant to Rule 404(b) for the purposes of proving identity requires more detailed analysis.

### Lack of Similarity

Certain findings of the trial court did not support the requirement of similarity. In 1994, both Defendant and Rue were young men. Defendant was nineteen, and Rue was twenty-two, making Defendant a few years younger than Rue. In 2007, Defendant was thirty-two and Watlington was sixteen. Defendant was a grown man and Watlington was still a youth. We find no similarities with regard to the ages of Rue and Watlington at the time they were killed. Age becomes even less of a similarity when Defendant's age, relative to the ages of Rue and Watlington, is considered.

We also find no relevant similarity in the trial court's recitation of how Rue and Watlington were linked to Defendant. According to evidence presented at trial, Defendant and Watlington had met before to transact drug business and, on the day he was killed, Watlington had talked to Defendant on the phone several times. The State's evidence tended to show that there was a drug-related relationship between Defendant and Watlington. There was no evidence of any relationship between Defendant and Rue prior to the 1994 shooting. Eutsey testified that his evidence showed Defendant and Rue were strangers. The fact that Rue and Perez had a sexual relationship, if true, had no bearing on the issue. The only connection between Defendant and Rue suggested by the evidence was that, when Defendant broke into Perez's apartment, Defendant found Rue (a stranger) in bed with his girlfriend and that Defendant killed him. We find more differences than similarities with this evidence. *Carpenter*, 361 N.C. at 389, 646 S.E.2d at 110. This "evidence" of similarity lacks probative value. *State v. Artis*, 325 N.C. 278, 299, 384 S.E.2d 470, 481 (1989), *judgment vacated on other grounds*, 494 U.S. 1023, 108 L.Ed.2d 604 (1990).

Other "similarities" found by the trial court fail to rise above mere generic behavior associated with crimes of this nature. *Carpenter,* 361 N.C. at 390, 646 S.E.2d at 111. Because they are easily carried and concealed, handguns are all too frequently used in shootings of the kind that occurred in 1994 and 2007. The handgun used in 1994 was a different caliber than the one used in 2007.

In the present case, the fact that neither Rue nor Watlington was armed, if true, is of little import. There is no reason to expect that Rue would have armed himself to engage in a romantic interlude with Perez. Further, all evidence suggests that Defendant could not have known whether there was anyone armed in Perez's apartment when he broke in. In other words, Defendant broke into the apartment without knowing, and apparently without caring, whether there might be an armed person inside.

We also give no weight to the fact, if true, that Perez and Currie were both frightened of Defendant. Primarily, the states of mind of Perez and Currie are irrelevant because Defendant had no control over their states of mind. Secondarily, assuming the facts as presented to be true, it would be more unusual in this kind of situation for eye-witnesses not to have been frightened. Perez and Currie were both, according to the State's evidence, in close proximity to what can fairly be termed executions. It is hard to imagine anything more generic than a feeling of fear in that situation—including the fear that the shooter might try to harm them if they discussed what they had seen.

The same applies to the State's evidence concerning the behavior of Rue and Watlington prior to being shot. We expect it is the rule, rather than the exception, that individuals who have guns placed to the backs of their heads are fearful and will plead for their lives. Whether such a victim is fearful or not, and whether a victim pleads or not, is again a product of the state of mind of the victim and does not reflect on the perpetrator.

Evidence that a defendant *made* victims plead for their lives, for example, would be considered in a different light. That kind of evidence would reflect on the character and, potentially, the *modus operandi* of the perpetrator, not just the states of mind of the victims. Such are not the facts in this case.

We are left with evidence that both Rue and Watlington were killed from shots fired at close range to their heads. Evidence also suggests both victims were lying face down at the time the shots were

fired. From the evidence presented, both killings may reasonably be called "execution style."

### Right to Confront Witness at Hearing

Defendant argues that much of Eutsey's testimony violated the Confrontation Clause of the Sixth Amendment to the United States Constitution. Specifically, Eutsey was allowed to testify on *voir dire* concerning statements Perez had made to him and other police officers in 1994. This testimony was allowed even though the State had apparently been in contact with Perez before the trial and could have subpoenaed her. Defendant's counsel argued:

> Ms. Perez, Your Honor, is available. She is alive, well and can come here and testify. Our information is that the State has been in contact with her. We have, too. And they more recently told her they didn't need her. They want a secondhand witness to describe an investigation that he can't testify about.

Defendant argued that he had not had any opportunity to cross-examine Perez, and that the State had made no showing that she was unavailable. Defendant argued: "In fact she is available. The State . . . actually had an order, material witness order that I think is still good to have her come from New Jersey."

The State, and the trial court, apparently agreed with Defendant, at least as a general proposition:

> COURT: All right. I've sent the jury back. Detective [Eutsey], if you'd come on back around. Mr. Johnson and Mr. Boone [the attorneys for the State], I'm assuming counsel for [D]efendant is saying that a lot of this testimony that [Detective Eutsey's] testifying to is not admissible.
>
> Mr. Boone: Your Honor, they're asking questions about facts that would be hearsay. But the questions that I've asked [Detective Eutsey] about what he personally observed and circumstances surrounding the crime scene and the crime are such that they would be admissible, and we would contend would be of a type of evidence that would allow for a, a comparison between the two killings.

The State then argued to the trial court that "there are many similarities here that don't even have to bring into account hearsay or Crawford." The State further stated that, if the trial court wanted "to go into the hearsay part of it," there was the testimony that both Rue and Watlington were begging for their lives.

The trial court appeared to state that it would not allow Eutsey to testify concerning statements Perez made, though this is not entirely clear from the transcript: Eutsey "has testified that the [c]ourt will not allow him to testify completely what Ms. Perez has testified, but he's testified to Ms. Perez was a witness to the killing."

While we find that Defendant raises a valid issue: whether the trial court can consider testimony that violates the Confrontation Clause in making its ruling on the admissibility of Rule 404(b) evidence, we need not answer that question here. This is because we hold that the testimony to which Defendant objects on Confrontation Clause grounds involved facts of the 1994 shooting that were not sufficiently similar to the 2007 shooting.

### Analysis

Facts surrounding the 1994 shooting will only be relevant, and thus admissible, if there are " 'some unusual facts present' " in both the 1994 shooting and the 2007 shooting which would allow a " 'reasonable inference that the same person committed both the earlier and the later crimes.' " *State v. Haskins,* 104 N.C. App. 675, 681, 411 S.E.2d 376, 381 (1991) (citations omitted). The unusual facts need not rise to the level of bizarre or unique signature elements. *Id.* In *Haskins,* this Court held that the State failed to provide sufficient unusual facts to support a reasonable inference that the defendant committed both an earlier robbery and the robbery for which he was on trial. *Id.* The State introduced evidence that in both robberies neither perpetrator wore a mask, and in both robberies the perpetrators yelled a demand for money. *Id.* at 682, 411 S.E.2d at 382. These "similarities" were too generic to constitute unusual facts. Furthermore, there were numerous dissimilarities between the two robberies. The crimes occurred in different towns, one "occurred on the deserted premises of a bank which was closed, involved gratuitous violence, and was committed by only one perpetrator." *Id.* at 682, 411 S.E.2d at 381-82. The other robbery was at a convenience store which was open for business, customers were present, "no shooting took place, and two perpetrators were involved." *Id.* at 682, 411 S.E.2d at 382.

In the present case, considering all the evidence presented on *voir dire,* we find many dissimilarities between the 1994 shooting and the 2007 shooting. In 1994, Defendant was nineteen and Rue was twenty-two. In 2007, Defendant was thirty-two and Watlington was sixteen. The 1994 shooting occurred in New Jersey, while the 2007 shooting occurred in North Carolina. The 1994 shooting was a crime

of passion. Defendant suspected Perez of being unfaithful, broke into her apartment while she was engaged in sexual activity with Rue, and shot Rue, a man Defendant had never met before, *because* Rue was being sexually intimate with Perez. Rue was shot in Perez's bed. Defendant initiated the contact with Rue in the 1994 shooting.

Watlington (according to the State's evidence) was shot in Defendant's apartment. Currie testified that Watlington was shot in Defendant's kitchen. Watlington had initiated contact with Defendant for the purposes of obtaining drugs, and Watlington had contacted Defendant for drugs in the past. There is certainly no evidence Watlington was involved with any girlfriend of Defendant's, and there is no evidence that the shooting of Watlington was a crime of passion. There was testimony that, while Defendant was in jail awaiting trial, he told someone that he killed Watlington for the purpose of robbing Watlington. There was no evidence that the shooting of Rue was for the purpose of robbing Rue.

Defendant made Perez leave the room so she would not witness the killing of Rue. Currie testified that Defendant called Jimmy Downey (Downey) and asked him to come to Defendant's apartment. Defendant invited Currie and Downey into his apartment and allowed them to witness him shooting Watlington and, in fact, left them alone with Watlington both before and after the shooting. Defendant used a .22 caliber handgun to shoot Rue twice in the head, while Watlington was shot once in the head with a .38 caliber handgun. There was no evidence that Defendant physically assaulted Rue before shooting him, but Currie testified that Defendant kicked Watlington in the head three times before shooting him. Defendant left Rue's body in Perez's apartment. Currie testified that Defendant told Downey to get Downey's car, and Defendant asked Currie to help him carry Watlington's body to the trunk of Downey's car. Defendant then instructed Currie and Downey to dispose of Watlington's body.

Against these dissimilarities, we have the similarity in the manner in which, according to the State's evidence, both Rue and Watlington were killed—shots to the back of the head while they were prone. Though the execution-style nature of the killings of both Rue and Watlington was an appropriate factor to consider when making the 404(b) determination, in light of the myriad dissimilarities between the two shootings, we do not find that this single similarity constitutes " 'substantial evidence tending to support a reasonable finding by the jury that [D]efendant committed [a] *similar* act.' " *Al–Bayyinah,*

356 N.C. at 155, 567 S.E.2d at 123. The primary impact of the evidence surrounding the 1994 shooting was that Defendant was shown to be the kind of person capable of shooting someone in the head because he had done it before in 1994. This is precisely the inference that Rules 403 and 404(b) were enacted to prevent. *McClain*, 240 N.C. at 173–74, 81 S.E.2d at 365–66. The trial court erred by allowing facts surrounding the 1994 shooting to be admitted at trial.

## II.

[2] Due to the highly inflammatory nature of the evidence surrounding Defendant's killing of Rue, and the contradictory evidence presented at Defendant's trial for the killing of Watlington, we cannot say that there is no reasonable possibility that, absent this error, a different result would have been reached at trial.

Because we have to determine the prejudice of the admission of the facts surrounding the 1994 shooting, we must examine the strengths and weaknesses of the State's case at trial. In doing so, we are not assuming the role of fact finder. We point out weaknesses in the State's case solely in support of our decision to grant a new trial. If this case is retried, it will be the sole province of the jury to determine weight and credibility with respect to the evidence.

The evidence presented at trial was replete with contradictions and internal inconsistencies, and so the prejudicial nature of the facts surrounding the 1994 shooting had a much greater potential to influence the jury's verdict. There were two narratives presented by the facts at trial. In the State's narrative, Defendant killed Watlington in Defendant's apartment—a killing that was witnessed, and testified to, by Currie. In Defendant's narrative, Watlington was alive and outside Defendant's apartment at a time inconsistent with Currie's narrative. Defendant's evidence suggested that Watlington was still alive when driven away from the Crescent Arms—possibly by Rock. Defendant's evidence suggested that Downey and, most importantly, Currie, were possibly involved in Watlington's murder.

Currie was fourteen on 11 August 2007. Currie testified that he was with his friend Downey, who was driving a silver Ford Taurus owned by Downey's friend Jennifer Evans, when Defendant called Downey several times and asked Downey and Currie to come to Defendant's apartment.

According to Currie, when they arrived at Defendant's apartment, Defendant was holding a handgun and had Watlington lying on the

STATE v. FLOOD

[221 N.C. App. 247 (2012)]

kitchen floor. At one point, Defendant went upstairs, leaving Watlington alone with Currie and Downey before returning to the kitchen. There was no explanation as to why Currie did not attempt to leave the apartment when Defendant went upstairs. There was no evidence suggesting reasons Downey, or Watlington, who was not bound, did not attempt to leave the apartment. While Currie and Downey stood in the kitchen with Defendant and Watlington, Defendant stomped on Watlington's head two or three times, then shot him once in the head. Defendant went upstairs and Currie heard Defendant talking to a man; then Defendant returned with some black cloth which he wrapped around Watlington's head. Defendant still had the gun with him, and Currie was afraid to run away. Defendant and Currie carried Watlington's body out the back door, as Downey pulled the Taurus around to the side of the apartment building. They put Watlington's body in the trunk of the Taurus, and Defendant told Currie and Downey to dispose of the body. Downey and Currie drove around to the front of the apartment building, where Currie saw broken glass beside a car parked in front of Defendant's apartment building. Currie saw some Hispanic women standing near the area of the broken glass, and heard people saying to call the police. Downey drove on, and they exited the parking lot. At trial, Currie identified a photograph of Lloyd's car, taken after the shooting, as the vehicle he had seen next to the broken glass as he left the apartment complex. The first officer on the scene testified that the only glass in front of Defendant's apartment was glass beside Lloyd's car from the driver's side window that had been shot out.

The State's expert testified that Lloyd and Watlington were shot by the same gun. This evidence, combined with Currie's testimony, suggests that Lloyd was shot before Watlington, though Currie did not notice Lloyd or Lloyd's shot-up car when he first approached Defendant's apartment; and Currie did not hear any gunshots other than the one that he says killed Watlington. Defendant was in possession of the same gun that was used to shoot Lloyd at the time Currie and Downey entered Defendant's apartment. If Watlington was in Defendant's apartment, then Lloyd had to have been parked in front of Defendant's apartment building at the time Downey and Currie arrived. This is also inconsistent with the statement of Crescent Arms resident Indigo Lee (Lee) that Downey's car was parked in front of Defendant's apartment an hour and a half before Lloyd was shot.

Other witness testimony makes it clear that immediately after Lloyd was shot, assistance was given to Lloyd, authorities were

called, and police arrived. If the police were there when Downey and Currie arrived, they almost certainly would have noticed. If Lloyd had just been shot when Downey and Currie arrived, and the police had not yet arrived, the police would have arrived by the time Currie testified he and Downey drove off with Watlington's body. Currie, however, testified that people were shouting for someone to call 911 as he and Downey left with Watlington's body.

Lloyd's testimony was very clear that Rock was the man who shot him. Other witness testimony supports Lloyd's testimony in this regard. The State's theory of the case was that the shooting of Watlington "had occurred immediately prior to the shooting of . . . Lloyd[.]" Currie's testimony contradicts this theory as well, because the single handgun used to shoot both Lloyd and Watlington could not have been with Defendant and Rock simultaneously. Watlington could not have been with Defendant and Rock simultaneously, either. In brief, in order for the jury to have believed Currie's testimony, it had to disregard Lloyd's testimony as false.

According to Currie, the only gunshot he heard was the one that killed Watlington, though according to the State's evidence, Lloyd was shot while Currie was only yards away. Currie testified that Downey drove to a house that he and Currie believed was unoccupied, removed Watlington's body from the trunk, and dumped it in a drainage ditch. Watlington's blood was found on the driveway of the house. Currie testified that Downey drove to two different self-service car wash businesses, where they used high pressure water hoses to wash blood out of the trunk of the car. Items recovered from the trunk, however, did not show signs of having been exposed to water.

According to the State, Lloyd was shot after Watlington. The State's ballistics expert testified that Lloyd and Watlington were shot with the same gun. According to Currie's testimony, however, Defendant still had the gun with him as Defendant and Currie carried Watlington's body out of the apartment and placed it into the trunk of the car. According to Currie's testimony, Lloyd had already been shot at the time they drove off with Watlington's body.

The primary witness for Defendant was Lloyd, the other shooting victim that day. Lloyd's account was incompatible with the account given by Currie. Lloyd testified that he saw Watlington with Rock and another man (not Defendant) just before Rock shot Lloyd. Lloyd further testified that he believed Rock forced Watlington into a black SUV and then drove off in the SUV with Watlington. If Lloyd saw

Watlington outside Defendant's apartment immediately prior to Lloyd's being shot, then Currie's account of the events could not have been correct.

Other witnesses at Defendant's apartment complex gave testimony that supported Lloyd's testimony. Currie testified that the shot that killed Watlington was "loud." Witnesses only reported two shots fired, not three. Lloyd was shot twice. Lee testified that she saw Rock approaching Lloyd's car and then heard two gunshots. Lee told Graham Police Detective Crystal Sharpe (Detective Sharpe) that she saw Rock get into the rear driver's side seat of a black SUV. Detective Sharpe testified:

> [Lee] said that [Downey] sped off behind the Expedition. The vehicles went past her apartment and exited the parking lot onto Larry Avenue. She said she previously seen [Downey]'s car parked in the end parking spot in front of [Defendant's apartment] at about one o'clock that day.

> And she said at the time of the incident, [Downey] was driving the car she identified as his, a silver car with plain windows and four doors. She said that the silver car left the parking lot and went in the same direction as the Expedition.

Lee and a friend went to help Lloyd while they waited for the authorities to arrive. A few minutes after the police arrived, Lee saw Defendant and Defendant's sister walking away from the apartment building. Defendant told Detective Sharpe that he was at his sister's apartment at the time of the shooting. The first officer arrived on the scene approximately three minutes after someone called and reported the shooting of Lloyd.

Currie testified that there was "a lot" of blood collected in the spot where Watlington had been shot. When asked if he saw "anything other than blood" like "any [other] kind of tissue," Currie answered that he saw "some gray stuff, some gray looking material." However, no confirmed blood or other DNA evidence associated with Watlington was recovered from Defendant's kitchen. Lee's testimony, if believed, would not have given Defendant sufficient time to clean up the kitchen before he was seen leaving the apartment complex. Further, according to Detective Sharpe, Lee had seen Downey's car at the apartment *an hour and a half before* the time of the shooting, which conflicts with the time frame set out in Currie's testimony, and would have put Currie and Downey at Defendant's apartment before Watlington and Lloyd arrived.

At 4:17 p.m., Detective Sharpe called and left a message with Defendant's wife for Defendant to contact Detective Sharpe. Defendant called Detective Sharpe shortly thereafter, and agreed to come to the police station to speak with Detective Sharpe. Defendant, along with his girlfriend, arrived at the station shortly before 7:00 p.m., approximately four and a half hours after Watlington was killed. Defendant told Detective Sharpe that he and his girlfriend had been at his sister's apartment, and had not been in his apartment, since that morning. Detective Sharpe asked Defendant to submit to a gunshot residue test, and Defendant consented. The test was never submitted for analysis. Detective Sharpe testified that it is recommended that a gunshot residue test be administered within four hours of the firing of the weapon. It had been approximately four and one half hours since the shooting. Defendant then allowed police to come into his apartment and look around. Police saw no signs of foul play or clean-up, and did not smell bleach. Though the State presented some evidence of cleaning in Defendant's kitchen, there was no evidence presented concerning when this cleaning took place and, more importantly, none of the areas showing signs of having been cleaned were where Currie testified to having seen blood and brain matter. The State presented no evidence of blood, DNA, or cleaning from the spot in the kitchen where Currie testified he saw Defendant shoot Watlington in the head. There was no evidence presented that the areas that did show signs of cleaning were in any manner suspicious or out of the ordinary for normal kitchen cleaning.

Further, Currie testified that

> [Defendant] stomped [Watlington] in the back of the head and told him to lay his head down. And then [Defendant] had went upstairs, and when he came back, [Watlington] had lifted his head again. And then [Defendant] stomped, he hit him, he kicked him in the back of the head again. Then he just got over top of him, and he shot him.

The coroner testified that Watlington did not have any bruising to his head. Currie did not explain what Watlington was doing when Defendant went upstairs with the gun, leaving Watlington alone with Currie and Downey. Police received an anonymous tip that there had been a body in the trunk of "the car that [Defendant] was in." Police searched the trunk of Defendant's girlfriend's car, but found nothing. Apparently, the police were receiving multiple anonymous tips concerning Watlington.

The first officer arrived on the scene at 2:35 p.m. Jayson Prutzman (Prutzman), an EMS technician, was responding to a call at an apartment complex across the street from Defendant's apartment at approximately 2:25 p.m. that day. Prutzman testified that he heard what he thought were two gunshots coming from the area of Defendant's apartment, and used both his radio and his phone to call and immediately report the suspected shots. He testified he made these calls at approximately 2:28 p.m. or 2:30 p.m. At least three residents of the Crescent Arms also heard two shots.

Crime scene tape was put up around the scene of Lloyd's shooting shortly after the first officer arrived, and this tape blocked off access to Defendant's front door. There still a police presence at Defendant's apartment at the time Defendant allowed Detective Sharpe to walk around in his apartment at about 8:30 p.m. No one reported seeing Defendant enter his apartment, or reported any activity at the apartment, between the time Defendant was seen leaving the area and the time Defendant allowed Detective Sharpe to walk around in the apartment. Lee had informed Detective Sharpe shortly after Lloyd's shooting that Rock was staying in Defendant's apartment. The police did not tape off or monitor the rear of Defendant's apartment building, and did not procure a warrant that day to search the apartment in which they had reason to believe Lloyd's shooter was staying.

The State's theory of the case was that Watlington was shot before Lloyd. For the State's theory to be correct, Defendant would have had to somehow have handed the gun over to Rock while Defendant was directing the disposal of Watlington's body. Currie, however, testified that Defendant retained the gun as Currie and Defendant carried Watlington's body out to Downey's vehicle. Currie testified that he never saw Rock. Currie's testimony tends to undermine this aspect of the State's theory of the case. However, parts of Currie's testimony are also incompatible with a scenario in which Lloyd was shot before Watlington.

The State argues that Lloyd's testimony is unreliable because Lloyd had a long history of prior convictions, and Lloyd had initially told police a different story concerning the events of that day. Currie also had a number of prior convictions, and Currie's account of what happened that day also changed over time. Currie admitted to disposing of Watlington's body. A jury certainly could decide that Currie had ample incentive to lie at trial. Currie was not charged with any crime, though his testimony was an admission to, *inter alia*, acces-

sory after the fact to murder. The jury could conclude that Currie received favorable treatment by the State because he testified in a manner that was helpful to the State's case against Defendant. Downey refused to testify, invoking the Fifth Amendment. Defendant's request that Downey be granted limited immunity was denied. We cannot say that Currie's credibility was so unimpeachable, and that Lloyd's credibility was so suspect, that the credibility issue could be removed from the hands of the jury.

According to the State's theory, Lloyd had not been shot when Downey and Currie backed into a space in front of Defendant's apartment, but Lloyd was waiting in his vehicle in front of Defendant's apartment. However, Lee testified that the car Downey was driving was at Defendant's apartment about an hour and a half before Lloyd was shot. If true, this testimony places Currie and Downey at the apartment long before Lloyd's shooting and, therefore, places them at the apartment long before Lloyd and Watlington arrived. Further, Defendant was in possession of the gun that was used to shoot Lloyd while Defendant, Currie and Downey were in Defendant's apartment, and Defendant did not leave the apartment until they were removing Watlington's body. According to the State's own evidence, Lloyd had been shot before Downey and Currie drove off with Watlington's body.

Lloyd, however, claims he saw Watlington alive in front of Defendant's apartment just before Rock shot Lloyd, and believes Watlington was forced into the black SUV. Lloyd was asked at trial if the prosecutors had asked him "if [Defendant] shot Jerrod Watlington?" Lloyd responded: "I said couldn't have, because I seen the boy alive being pulled away to the SUV and taken off." Lee testified that she saw Rock near Lloyd's car, heard two shots, then saw Rock get into a black SUV. Lee then saw the SUV speed away, followed by Downey's silver car. Lee knew Defendant, Rock, Lloyd, and Downey. Lee was also familiar with Lloyd's and Downey's vehicles. According to Lee's testimony, assuming that Downey and Currie did leave the apartment complex in the silver car, they followed the black SUV out of the complex, or at least left at the same time. If Lee's testimony is believed, Downey and Currie left at the same time as Rock, which was immediately after Rock shot Lloyd. It is not at all clear how the handgun that killed both Watlington and Lloyd could have been passed between Defendant and Rock, and both shootings accomplished, in the timeframe established by the testimony. There was evidence presented at trial supporting a theory that Watlington was driven off alive from the Crescent Arms and killed elsewhere.

There was not overwhelming evidence of Defendant's guilt presented at trial unless Currie's testimony was believed. There was ample contradictory testimony, and a fair amount of evidence challenging Currie's testimony. It was for the jury to decide the weight and credibility of all the evidence, and we cannot say that, absent the improper admission of the facts surrounding the 1994 killing of Rue, there was no "reasonable possibility that . . . a different result would have been reached at the trial out of which the appeal arises." N.C.G.S. § 15A–1443(a) (2011). We therefore reverse and remand for a new trial.

Because of our holding above, we do not address Defendant's other arguments on appeal.

New trial.

Chief Judge MARTIN and Judge CALABRIA concur.